Anthony M. Barnes (Bar No. 199048)
Email: amb@atalawgroup.com
Jason R. Flanders (Bar No. 238007)
Email: jrf@atalawgroup.com
AQUA TERRA AERIS LAW GROUP LLP
4030 Martin Luther King Jr. Way
Oakland, CA 94609
Telephone: (415) 326-3173

Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
Armita Ariano (Bar No. 314434)
Email: armita@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiff Orange County Coastkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California non-profit corporation,<br><br>  Plaintiff,<br><br>  v.<br><br>ACRA AEROSPACE LLC, a Delaware corporation; ALEMI PROPERTIES, LLC; and NOVARIA COMPONENT SOLUTIONS, LLC,<br><br>  Defendants. | Civil Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

Orange County Coastkeeper ("Coastkeeper" or "Plaintiff"), by and through counsel, hereby alleges:

## I.    JURISDICTION AND VENUE

1.    Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* (the "Clean Water

Act" or the "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States). On October 29, 2021, Plaintiff issued a 60-day Notice of Violation and Intent To Sue letter (the "Notice Letter"), attached hereto as **Exhibit A** and fully incorporated by reference herein, to Acra Aerospace LLC ("Acra"), Alemi Properties LLC ("Alemi"), and Novaria Component Solutions LLC ("Novaria") (collectively, "Defendants"), as the owners and operators of the Facility (individually and collectively, the "Owner" and/or "Operator"). The Notice Letter informed Defendants of the violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order 20XX-XXXX-DWQ (effective July 1,2020*) (hereinafter, the "Storm Water Permit") and the Clean Water Act at the subject industrial facility located at 2121 E. Via Burton, Anaheim, California 92806 (the "Facility"). The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the Storm Water Permit and the Clean Water Act.

2.      The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Acting Regional Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board (the "State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region (the "Santa Ana Regional Board" or "Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

3.      Sixty (60) days have passed since the Notice Letter was sent via certified mail to Defendants and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA, USDOJ, nor the State of California have commenced

or are diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

4. Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

5. Plaintiff seeks relief for Defendants' substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from industrial activities at the Facility.

## II. **INTRODUCTION**

6. This complaint seeks relief for the Defendants unlawful discharges of pollutants into waters of the United States from its industrial operations at the Facility. Specifically, Coastkeeper is informed and believes, and thereon alleges, that Defendants' discharges of pollutants from the Facility enter into the Orange County Municipal Separate Storm Sewer System ("MS4") and into Carbon Creek, a tributary to Coyote Creek which flows into the San Gabriel River and into the Pacific Ocean (collectively referred to as the "Receiving Waters"), in violation of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act. These violations have been occurring since at least November 12, 2019 and are ongoing and continuous.

7. With every significant rainfall event, millions of gallons of polluted rainwater, originating from industrial operations such as the Facility, pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals, such as aluminum, iron, magnesium, chromium, copper, lead, mercury, nickel, and zinc, as well as high concentrations of nitrate and nitrite,

and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to surface waters such as the Receiving Waters.

## III. PARTIES

### A. Orange County Coastkeeper.

8. Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California and has over 1,300 members. Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

9. Orange County Coastkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of Orange County. To further these goals, Orange County Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

10. Members of Orange County Coastkeeper live and own homes in the San Gabriel River Watershed and use and enjoy the waters to which the Facility discharges storm water. Members of Orange County Coastkeeper use these waterways to participate in a variety of water sports and other activities including, but not limited to, fishing, swimming, boating, kayaking, bird watching, viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking, running, and engaging in scientific study, including monitoring, restoration, and research activities. The discharge of pollutants from the Facility impairs each of these uses.

11. Defendants' failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act including, but not limited to, discharges of polluted storm water from the Facility, failure to report such

pollution, and failure to act in accordance with the Storm Water Permit to improve the quality of storm water discharges from the Facility, degrades water quality and harms aquatic life in the Santa Ana River and its tributaries, and impairs Orange County Coastkeeper members' use and enjoyment of those waters, giving Plaintiff standing on behalf of its members.

12.     The violations of the Storm Water Permit and Clean Water Act at the Facility are ongoing and continuous. Thus, the interests of Coastkeeper, Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Storm Water Permit and the Clean Water Act. The relief sought herein will redress the harms to Plaintiff's members caused by Defendants' activities.

13.     Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B. The Owner and/or Operator of the Facility.**

14.     Acra is the current owner and/or operator of the Facility, and has been the owner and/or operator of the Facility since at least 2017, and is the responsible party under the Clean Water Act.

15.     Coastkeeper is informed and believes, and thereon alleges, that Acra is an active Delaware limited liability company registered and authorized to do business in California.

16.     Coastkeeper is informed and believes, and thereon alleges, that The Corporation Company is the registered agent for service of process for Acra located at 555 Capitol Mall Suite 1150, Sacramento, CA 95814.

17.     Coastkeeper is informed and believes, and thereon alleges, that Jed Burmahln is the Facility Contact identified by Acra in its Notice of Intent ("NOI") for coverage under the Storm Water Permit and is also identified as the Legally Responsible Person in the Facility's Storm Water Pollution Prevention Plan ("SWPPP").

18.     Coastkeeper is informed and believes, and thereon alleges, that the owner of

the land upon which the Facility operates is Alemi Properties, LLC.

19. Coastkeeper is informed and believes, and thereon alleges, that Alemi has a lease agreement or other contractual relationship with Acra that gives Alemi knowledge and/or control of Acra's industrial activities.

20. Coastkeeper is informed and believes, and thereon alleges that Novaria Component Solutions, LLC is listed as Acra's manager or member on the California Secretary of State Limited Liability Company form filed by Acra on July 26, 2019 and may also be an owner and/or operator with knowledge and control of the industrial activities giving rise to the alleged violations of the Clean Water Act.

## IV. LEGAL BACKGROUND

### A. The Clean Water Act.

21. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

22. The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

23. The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

24. The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

25. "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of

the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

26.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce. *Id.*

27.    The Clean Water Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

28.    A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

29.    A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

30.    Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

31.    Defendant is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

32.    An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

33.    Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $56,460 per day per violation for all violations that occurred after

November 2, 2015 and were assessed on or after December 23, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

34.   Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.   California's Storm Water Permit.**

35.   Section 402(p) of the Clean Water Act establishes a framework for regulating industrial storm water discharges under the NPDES permit program. 33 U.S.C. § 1342(p).

36.   Section 402(b) of the Clean Water Act allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water. *See* 33 U.S.C. § 1342(b). States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. *See id.*

37.   California is a state authorized by EPA to issue NPDES permits.

38.   In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

39.   The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to the Clean Water Act.

40.   The Storm Water Permit was issued on July 1, 2015 pursuant to Order No. 2014-0057-DWQ.

41.   On November 6, 2018, pursuant to Order No. 2015-0122-DWQ, the State Board amended the Storm Water Permit to incorporate Total Maximum Daily Load ("TMDL") implementation requirements for waterbodies subject to TMDLs with contributions from industrial dischargers.

42.   In order to discharge storm water to waters of the United States lawfully in

California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit. Storm Water Permit Finding #12. Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* Storm Water Permit, Finding 17.

43.     Violations of the Storm Water Permit are violations of the Clean Water Act. *See* Storm Water Permit, Section XXI(A) (Duty to Comply).

44.     The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* Storm Water Permit, Discharge Prohibition III(B).

**C.     The Storm Water Permit's Technology Based Effluent Limitations.**

45.     The Storm Water Permit Effluent Limitations require dischargers covered by the Storm Water Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. *See* Storm Water Permit, Section V(A).

46.     Pursuant to the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); Storm Water Permit, Effluent Limitation V(A).

47.     EPA's NPDES Storm Water Multi-Sector General Permit for Industrial

Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the Storm Water Permit via the Table 2 Numeric Action Levels ("NALs"). *See* Storm Water Permit, Monitoring, Sampling and Analysis, XI(B).

48. The EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. Storm Water Permit, Effluent Limitation V(A); *See* EPA's NPDES MSGP Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000).

49. The EPA Benchmarks and NALs for the following parameters are as follows: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; copper – 0.0332 mg/L; zinc – 0.26 mg/L; nickel – 1.02 mg/L;  iron – 1.0 mg/L; nitrate plus nitrate as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. Additional EPA Benchmarks for heavy metals, which depend on the hardness of the receiving water, also apply to storm water discharges from the Facility.

50. Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the Facility. *Id*.

### D. The Storm Water Permit's Numeric Effluent Limitations.

51. Effective July 1, 2020, the Storm Water Permit establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into water bodies that have approved TMDLs set forth in Storm Water Permit, Attachment E.

52. An instantaneous maximum NEL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceeds the instantaneous maximum NEL value. Storm Water Permit, Section V(C)(1).

53. An exceedance of an NEL is a violation of the Storm Water Permit

1   and the Clean Water Act. *Id.*

2   54.   The Facility is subject to the San Gabriel River TMDL requirements

3   for metals and selenium, which include the following NELs: copper – 0.027 mg/L, and

4   zinc – 0.158 mg/L. Storm Water Permit, Attachment E.

5   **E.   The Storm Water Permit's Receiving Water Limitations.**

6   55.   The Receiving Waters are ecologically sensitive areas, which provide an

7   essential habitat for dozens of fish and bird species as well as macro-invertebrate and

8   invertebrate species, including rare and/or threatened aquatic species. Storm water and

9   non-storm water contaminated with sediment, heavy metals, and other pollutants harm the

10  special biological significance of the Receiving Waters. Exposure to polluted storm water

11  harms the special aesthetic and recreational significance that the surface waters have for

12  people in the surrounding communities. The public's use of the surface waters exposes

13  people to toxic metals and other contaminants in storm water and non-storm water

14  discharges. Non-contact recreational and aesthetic opportunities, such as wildlife

15  observation, are also impaired by polluted discharges to surface waters such as the

16  Receiving Waters.

17  56.   The CWA and the Storm Water Permit's Receiving Water Limitations

18  prohibit storm water discharges and authorized non-storm water discharges that cause or

19  contribute to an exceedance of any applicable Water Quality Standards ("WQS"). 33

20  U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§122.4(d), 122.4(i), 122.44(d); Storm Water Permit,

21  Receiving Water Limitation VI(A).

22  57.   WQS establish the water quality goals for a water body. 40 C.F.R. §131.2.

23  58.   WQS are pollutant concentration levels determined by the State Board, the

24  various regional boards, and the EPA to be protective of the beneficial uses of the waters

25  that receive polluted discharges.

26  59.   Discharges above or below WQS cause and/or contribute to impairment of

27  the beneficial uses of the waters that receive polluted discharges.

28  60.   The State of California regulates water quality through the State Board and

Complaint                                   11

the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan, called a basin plan, which contains WQS for water bodies within its geographical area.

61.    The Santa Ana Regional Board adopted the Basin Plan for the Santa Ana Region (the "Santa Ana Basin Plan" or the "Basin Plan"). The Santa Ana Basin Plan identifies the "Beneficial Uses" of water bodies in the Santa Ana Regional Board's region, which includes the San Gabriel River drainages. The existing, potential and intermittent beneficial uses identified in the Basin Plan for Carbon Creek include: municipal and domestic supply (MUN); groundwater recharge (GWR); water contact recreation (REC1); non-contact water recreation (REC2); warm freshwater habitat (WARM); and wildlife habitat (WILD). *See* Santa Ana Basin Plan at Table 3-1. The existing, potential, and intermittent beneficial uses identified in the Basin Plan for Coyote Creek include: MUN; REC 1; REC 2; WARM; WILD; and rare, threatened and endangered species (RARE). *See id*. The beneficial uses identified in the Basin Plan for the San Gabriel River in the nearshore zone are industrial service supply, navigation, REC 1, REC 2, commercial and sportfishing, WILD, RARE, marine habitat, shellfish harvesting, spawning, reproduction and development. *See id*.

62.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

63.    According to the 2016 303(d) List of Impaired Water Bodies, the Receiving Waters are listed for the following water quality impairments: pH, nickel, dissolved oxygen, copper, dissolved copper, dioxin, temperature, iron, toxicity, malathion, and indicator bacteria. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic-dependent wildlife that depend on these waters. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

64.    Discharges of polluted storm water to the Receiving Waters pose threats to

the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

65.     Discharges of pollutants at levels above WQS, like those from the Facility, cause or contribute to the impairment of the Beneficial Uses of the Receiving Waters.

66.     WQS may be either numeric or narrative objectives. Applicable WQS include, among others, the water quality objectives in the Basin Plan, and the Criteria for Priority Toxic Pollutants in the State of California ("CTR"), 40 C.F.R. § 131.38.

67.     The Santa Ana Basin Plan provides that "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Santa Ana Basin Plan, 4-18.

68.     The Santa Ana Basin Plan also includes a narrative WQS that establishes a toxicity standard which states that "[t]he concentrations of toxic substances in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Santa Ana Basin Plan, 4-20.

69.     Further, the Santa Ana Basin Plan states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." *See* Santa Ana Basin Plan 4-20.

70.     The Santa Ana Basin Plan also states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." Santa Ana Basin Plan 4-26.

71.     The CTR establishes numeric WQS to protect human health and the environment in the State of California. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008         (April         2000),         available         at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

72.     The numeric WQS established in the CTR for zinc is 0.12 mg/L, nickel is .47 mg/L, and for copper is 0.013 mg/L, assuming a water hardness calculation of 100 mg/L.

73.     The CTR numeric limits are expressed as dissolved metal concentrations.

74.     Discharges with pollutant levels that cause or contribute to an exceedance of the CTR criteria, the Basin Plan standards, and/or other applicable WQS in the Receiving Waters are violations of Receiving Water Limitation Section VI(A) of the Storm Water Permit.

75.     The Storm Water Permit's Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* Storm Water Permit, Section VI(B).

76.     Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI(B) of the Storm Water Permit.

**F.      The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements.**

77.     Dischargers must develop and implement a SWPPP prior to conducting, and in order to continue, industrial activities. Storm Water Permit, Sections I(I) (Finding 54), X(B). The SWPPP must meet all of the requirements of the Storm Water Permit. Storm Water Permit, Sections X(A)-(H); See also Storm Water Permit, Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. Storm Water Permit, Section X(G).

78.     The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. Storm Water Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. Storm Water Permit, Section I(D) (Finding 32), Section X(C).

79.     The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction

of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X.

80.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section X.

81.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Storm Water Permit, Section X(A)-(B). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. Storm Water Permit, Section X(B) and XV.

82.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. Storm Water Permit, Sections I(J) (Finding 55), X(B)(1).

**G.** **The Storm Water Permit's Monitoring Implementation Program Requirements.**

83.    The Storm Water Permit requires permittees to develop and implement a storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. Storm Water Permit, Sections X(I) and XI.

84.    The Storm Water Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the Storm Water Permit. Storm Water Permit Sections X(I) and XI(A)-XI(D).

85.    The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* Storm Water Permit, Section XI.

86.    An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility, and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id*.

87.    The Storm Water Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the Storm Water Permit. Storm Water Permit, Section XI(B).

88.    Section XI(A)(1) of the Storm Water Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution.

89.    Section XI(A)(2) of the Storm Water Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odor in the discharge, and the source of any pollutants in storm water discharges from the facility.

90.     Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* Storm Water Permit, Section XI(A)(3).

91.     The Storm Water Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. Storm Water Permit Section XI(B)(4).

92.     Section XI(B)(1) of the Storm Water Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area.

93.     The Storm Water Permit requires dischargers to collect and analyze storm water samples from at least two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30), which must be analyzed for TSS, pH, O&G and additional parameters identified on a facility-specific basis that serves as indicators of the presence of all industrial pollutants identified in the pollutant source assessment—in addition to those required under the Standard Industrial Classification ("SIC") code. Storm Water Permit, X(B)(3) and X(G)(2).

94.     Table 1 of the Storm Water Permit requires dischargers with SIC code 3479 (Coating, Engraving, and Allied Services, Not Elsewhere Classified) to analyze samples for zinc and N+N.

95.     Section XI(B)(6)(c) of the Storm Water Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

96.     Section XI(B)(6)(f) of the Storm Water Permit requires dischargers to analyze additional parameters required by the Regional Board.

97.     Section XI(B)(6)(e) of the Storm Water Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved TMDLs.

98.     Section XI(B)(11) of the Storm Water Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty (30) days of obtaining all results for each sampling event.

**H.     The Storm Water Permit's Exceedance Response Actions Requirements.**

99.     Under the Storm Water Permit, facility operators are required to perform Exceedance Response Actions ("ERA") as appropriate whenever sampling indicates NAL exceedances.

100.     An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter.

101.     An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. Storm Water Permit, Section XII(A).

102.     Upon receiving NOI coverage, all permittees are deemed in "Baseline status." See Storm Water Permit, Section XII(B).

103.     A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an NAL exceedance for that same parameter. *See* Storm Water Permit, Section XII(C).

104.     Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. Storm Water Permit, Section XII(C). By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances

and to comply with the requirements of Storm Water Permit. *See* Storm Water Permit, Section XII(C)(1)(a)-(c).

105.   Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* Storm Water Permit, Section XII(C)(1)(c).

106.   Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* Storm Water Permit, Section XII(C)(2)(a)(i)-(ii).

107.   The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See* Storm Water Permit, Section XII(C)(2)(a)(iii).

108.   A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. Storm Water Permit, Section XII(C)(2)(b).

109.   A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the discharger is in Level 1. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. Storm Water Permit, Section XII(D).

110.   A discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during with the NAL exceedances occurred. On January 1 of

the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS. Storm Water Permit, Section XII(D).

**I.    The Storm Water Permit's Annual Reporting Requirements.**

111.    Section XVI of the Storm Water Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

112.    The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the requirements of the Storm Water Permit, an explanation for, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. *See* Storm Water Permit, Section XVI.

113.    Annual Reports are certified by the legally responsible person under penalty of perjury.

**V.    FACTUAL BACKGROUND**

**A.    The Facility's Storm Water Permit Coverage.**

114.    Plaintiff is informed and believes, and thereon alleges, that on or about November 12, 2019, Defendants obtained Storm Water Permit coverage for the Facility by submitting an NOI to the State Board.

115.    Plaintiff is informed and believes, and thereon alleges, that the Facility's NOI identifies the operator of the Facility as Acra Aerospace LLC with an address of 2121 E Via Burton Avenue, Anaheim, California 92806.

116.    Plaintiff is informed and believes, and thereon alleges, that the Facility's NOI lists the Facility as 43,560 square feet in size, with 600 square feet of industrial area exposed to storm water.

117.    Plaintiff is informed and believes, and thereon alleges, that the Facility's NOI indicates that 99% of the Facility, including rooftops, is impervious.

118.    Plaintiff is informed and believes, and thereon alleges, that the Facility's

operating hours, per the Facility SWPPP, are Monday through Thursday from 5:00 AM to 2:30 PM and Friday from 5:00 AM to 9:30 AM.

119.   Plaintiff is informed and believes, and thereon alleges, that the Facility applied for and obtained No Exposure Certification coverage from 2017-2018 with a Waste Discharge Identification ("WDID") number 8 30NEC002934.

120.   Plaintiff is informed and believes, and thereon alleges, that on October 22, 2019 the Regional Board sent a Notice of Violation for Non-Compliance with the Storm Water Permit for failing to file for coverage under the Storm Water Permit.

121.   Plaintiff is informed and believes, and thereon alleges, that on or around November 12, 2019, the Owner and/or Operator submitted to SMARTS its Notice of Intent to comply with the Storm Water Permit.

122.   The State Board's electronic SMARTS database lists the current Facility WDID number as 8 30I028435.

123.   SMARTS lists the Facility's coverage under the Storm Water Permit as "Active."

124.   The NOI lists the SIC codes for the Facility as 3728 (Aircraft Parts and Auxiliary Equipment, NEC) and 3479 (Coating, Engraving, and Allied Services, NEC).

125.   The Facility must obtain Storm Water Permit coverage for the entire Facility. *See* Storm Water Permit, Section XVII(E)(1).

126.   Plaintiff is informed and believes, and thereon alleges, that additional SIC codes, including 3499 (Fabricated Metal Products, NEC), 3599 (Industrial and Commercial Machinery and Equipment), may also apply to the Facility.

127.   Plaintiff is informed and believes, and thereon alleges, that the Owner and/or Operator is required to sample storm water for TSS, O&G, pH, zinc, aluminum, titanium, N+N, copper, nickel, dissolved zinc, dissolved copper, and dissolved nickel.

**B.    Industrial Activities and Pollutant Sources at the Facility.**

128.   Plaintiff is informed and believes, and thereon alleges, that the Facility's primary industrial purpose is aerospace component fabrication and manufacturing.

129.   Plaintiff is informed and believes, and thereon alleges, that the primary industrial processes at the Facility include turning, millings, cutting of metal alloys (aluminum, nickel and titanium) and spray coating.

130.   Plaintiff is informed and believes, and thereon alleges, that industrial activities occur both indoors and outdoors at the Facility.

131.   Plaintiff is informed and believes, and thereon alleges, that the Facility's ancillary operations include machine maintenance, housekeeping, sales, and administrative activities.

132.   Plaintiff is informed and believes, and thereon alleges, that the Facility manufactures custom parts that are processed in the building fronting Via Burton using nineteen computer numerical control machines, two water jet cutters, buffers, grinders, tapping machines, saw cutting machines, lathes, and manual mills.

133.   Plaintiff is informed and believes, and thereon alleges, that post-production processes include the use of ultrasonic cleaning vats, a spray booth, a curing oven, two de-burring booths, three optical comparators, one packing machine, and one self-contained, naphtha-based degreasing basin which are conducted in an adjoining building located to the northeast of the main building.

134.   Plaintiff is informed and believes, and thereon alleges, that the Facility receives stock, bar, and plate stainless steel, high nickel alloys, and titanium, and operates two propane forklifts and one electric scissor lift.

135.   Plaintiff is informed and believes, and thereon alleges, based on information in the Facility's SWPPP, that potential pollutant sources at the Facility include drips and leaks of automotive fluids, machining operations, hazardous waste storage, metal bar stock and machinery stored outside, forklift and vehicle traffic, metal shavings (including chips and flakes) from production area(s), the spray stack booth, the water jet cutter, the turning/milling area(s) (including of metal alloys), the shipping and receiving area, outdoor storage of metal shaving from machining activities and of oily waste water from the jet cutter.

136.   Plaintiff is informed and believes, and thereon alleges, that pollutants have been and continue to be tracked throughout the Facility by vehicles and machinery, which is tracked to areas of exposure and then outside of the Facility.

137.   Plaintiff is informed and believes, and thereon alleges, that pollutants that are tracked outside the Facility enter the municipal storm drain and are carried to the Receiving Waters by non-storm water discharges, such as irrigation runoff or other means.

138.   Plaintiff is informed and believes, and thereon alleges, that the industrial activities and areas at the Facility include, but are not limited to, the activities and areas described in paragraphs 128-137 herein.

139.   Plaintiff is informed and believes, and thereon alleges, that the areas of industrial activity and industrial activities at the Facility are sources of pollutants.

140.   Plaintiff is informed and believes, and thereon alleges, the Facility's Owner and/or Operator has not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

141.   BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events.

142.   Plaintiff is informed and believes, and thereon alleges, the Facility Owner's and/or Operator's failure to develop and/or implement required BMPs results in the exposure of pollutants associated with their industrial activities to precipitation, and results in the Facility's discharge of polluted storm water from the Facility washing into the storm sewer system, which flows into the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

143.   Plaintiff is informed and believes, and thereon alleges, that these illegal discharges of polluted storm water negatively impact Plaintiff's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

**C.    The Facility's Storm Water Flow, Sampling Point, and Discharges to the Receiving Waters.**

144.    Plaintiff is informed and believes, and thereon alleges, that the Facility contains roof drainage and sheet flow runoff that takes place in paved parking areas and driveways between the two site buildings.

145.    Plaintiff is informed and believes, and thereon alleges, that storm water drains to the south of the Facility along a concrete swale located in a parking area east of the main building, which ultimately discharges into the concrete gutter on the street.

146.    The Facility's SWPPP indicates that Facility has one discharge point.

147.    The Facility's SWPPP indicates the Facility has one storm water sampling point located on the south driveway adjacent to the entrance/exit of the site parking lot which accepts storm water from the roofs, industrial activities, the loading and unloading area between the two industrial buildings on site, the outdoor storage of materials.

148.    Plaintiff is informed and believes, and thereon alleges, that discharges of pollutants from the Facility enter into the Orange County MS4 and into Carbon Creek, a tributary to Coyote Creek which flows into the San Gabriel River and into the Pacific Ocean.

149.    Plaintiff is informed and believes, and thereon alleges, that Carbon Creek, Coyote Creek, the San Gabriel River, and the Pacific Ocean are waters of the United States.

**D.    Defendants' Violations of the Storm Water Permit's Receiving Water Limitations.**

150.    Plaintiff is informed and believes, and thereon alleges, that the Facility's discharges include concentrations of metals and other pollutants that cause exceedances of the Basin Plan's narrative WQS.

151.    Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility contain elevated concentrations of metals and other pollutants, which adversely impact human health and the environment.

152.   Plaintiff is informed and believes, and thereon alleges, that each time polluted storm water is discharged from the Facility, the Facility Owner and/or Operator violates the Basin Plan's narrative WQS.

153.   Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by Plaintiff demonstrate that discharges from the Facility contain concentrations of zinc that cause or contribute to a violation of an applicable WQS in the CTR. For example, the storm water sample collected by Plaintiff on March 3, 2021 contained zinc at .21 mg/L, which exceeds the CTR value of .12 mg/L.

154.   Plaintiff is informed and believes, and thereon alleges, that each time polluted storm water discharges from the Facility, Facility Owner and/or Operator violates the numeric WQS in the CTR and, by extension, the CWA.

155.   Plaintiff is informed and believes, and thereon alleges, that storm water samples collected at the Facility demonstrate that discharges from the Facility contain pH values that cause or contribute to a violation of an applicable WQS in the Basin Plan.

156.   Plaintiff is informed and believes, and thereon alleges, that storm water samples uploaded to SMARTS on April 5, 2021 demonstrate a pH level of 6 in violation of the Basin Plan's receiving water limitations.

157.   Plaintiff is informed and believes, and thereon alleges, that storm water samples uploaded to SMARTS on December 15, 2021 demonstrate a pH level of 6 in violation of the Basin Plan's receiving water limitations.

158.   Plaintiff is informed and believes, and thereon alleges, that each time polluted storm water discharges from the Facility, Facility Owner and/or Operator violates the numeric WQS in the Basin Plan and, by extension, the CWA.

159.   Plaintiff is informed and believes, and thereon alleges, that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged from the Facility in violation of the Storm Water Permit.

160.   Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water

Limitation VI(A) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

161.   Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation VI(B) of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

**E.    Defendants' Violations of the Storm Water Permit's Technology Based Effluent Limitations.**

162.   Plaintiff is informed and believes, and thereon alleges, that BMPs that achieve BAT/BCT have not been implemented at the Facility.

163.   Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above benchmark levels established by the EPA and incorporated into the Storm Water Permit.

164.   Plaintiff is informed and believes, and thereon alleges, that storm water discharges from the Facility contain concentrations of pollutants with exceedances of NALs for O&G, N+N, aluminum, copper, and zinc.

165.   Plaintiff is informed and believes, and thereon alleges, that for the 2019-2020 reporting year, the Facility exceeded NALs for O+G and zinc.

166.   Plaintiff is informed and believes, and thereon alleges, that for the 2020-2021 reporting year, the Facility exceeded NALs for N+N, aluminum, copper, and zinc.

167.   Plaintiff is informed and believes, and thereon alleges, that the ongoing exceedances of NALs demonstrate that the Facility Owner and/or Operator has failed and continues to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards in order to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water from the Facility.

168.   Plaintiff is informed and believes, and thereon alleges, that the technology based effluent limitations of the Storm Water Permit are violated each time storm water discharges from the Facility.

169.   Each day the Owner and/or Operator has failed to develop and implement BAT and BCT at the Facility in violation of the Storm Water Permit is a separate and distinct violation of the Clean Water Act.

170.   The Owner and/or Operator has been in violation of the BAT and BCT requirements at the Facility every day since at least November 12, 2019.

### F.   Defendants' Violations of the Storm Water Permit's Numeric Effluent Limitations

171.   Plaintiff is informed and believes, and thereon alleges, that the Facility has exceeded the NELs for zinc and copper during the 2020-2021 reporting year.

172.   Storm water samples uploaded by the Owner and/or Operator to SMARTS on January 11, 2021 demonstrate copper levels at 0.0293 mg/L and zinc levels at 0.56 mg/L, both of which exceed the NEL limitation for copper and zinc.

173.   Storm water samples uploaded by the Facility to SMARTS on April 5, 2021 demonstrate copper levels at 0.0589 mg/L and zinc levels at 0.96 mg/L, both of which exceed the NEL limitation for copper and zinc.

174.   Plaintiff is informed and believes, and thereon alleges, that based on the storm water sample results described in paragraphs 172-173 herein, the Facility exceeded the instantaneous maximum NEL in violation of Storm Water Permit V(C)(1).

175.   Plaintiff is informed and believes, and thereon alleges, that NEL violations occur each time storm water discharges from the Facility.

176.   Each day the Owner and/or Operator exceeds the Storm Water Permit's numeric effluent limitations is a separate and distinct violation of the Clean Water Act.

177.   The Owner and/or Operator has been in violation of the Storm Water Permit's numeric effluent limitations since at least December 28, 2020.

/ / /

G. **Defendants' Violations of the Storm Water Permit's SWPPP Requirements.**

178.   The Facility's SWPPP is publicly available via the SMARTS database and is dated November 11, 2019 and revised on October 14, 2020.

179.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP referenced in paragraph 178 is the current SWPPP for the Facility.

180.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise a SWPPP, in violation of SWPPP requirements of the Storm Water Permit.

181.   Plaintiff is informed and believes, and thereon alleges, that a site map ("Site Map") was uploaded to SMARTS on November 12, 2019 and most recently on November 9, 2020, and that the Site Map is a map of the Facility submitted pursuant to Section II(B)(3)(a) of the Storm Water Permit.

182.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP for the Facility fails to include a procedure for identifying alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable pursuant to Storm Water Permit, Section X(D)(1)(c).

183.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Site Map contains certain figures that are not depicted in the legend and are therefore unascertainable in violation of Storm Water Permit, Section X(E)(1).

184.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Site Map is also out of compliance with the Storm Water Permit by failing to identify: (i) descriptions or depicted locations of structural control measures that affect industrial storm water discharges, authorized NSWDs, and/or run-on; (ii) identification of impervious areas at the Facility, including paved areas, covered storage areas, or other roofed structures; (iii) depictions of locations where materials are directly exposed to precipitation and the locations where identified spills or leaks have occurred; and (iv)

shipping and receiving areas, fueling areas and/or vehicle storage.

185. The Facility's SWPPP reads: "Downspouts have been configured to efficiently convey storm water from the roof down to the surface drainage structures;" however, the Site Map fails to depict more than one downspout.

186. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to update the Site Map in the Facility's SWPPP in accordance with the Facility's Level 1 ERA Report.

187. Plaintiff is informed and believes, and thereon alleges, that the list of industrial materials contained within the SWPPP does not sufficiently depict locations where each material is stored, received, shipped, and handled as required by the Storm Water Permit, Section X(F).

188. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator indicated in its 2020-2021 Annual Report that it was unable to sample the requisite qualifying storm events due in part to a reduction of working hours as a result of the COVID-19 pandemic.

189. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator failed to revise the SWPPP pursuant to Storm Water Permit, Section X.D.2.d., to reflect the change in operating hours during the ongoing COVID-19 pandemic.

190. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed to adequately revise the SWPPP in response to ongoing high concentrations of pollutants.

191. Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

192. Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least November 12, 2019.

**H.    Defendants' Violations of the Storm Water Permit's Monitoring Implementation Plan Requirements.**

193.    The Facility's SWPPP section entitled: "Monitoring Implementation Plan" discusses the Facility's MIP.

194.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been conducting, and continues to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

195.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator is not sampling for all pollutants present at the Facility including pH, titanium, dissolved copper, and dissolved nickel.

196.    Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to collect storm water discharge samples as required pursuant to Section XI(B)(3) of the Storm Water Permit, which requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year and two QSEs within the second half of each reporting year.

197.    Plaintiff is informed and believes, and thereon alleges, that in the 2019-2020 reporting year, the Facility Owner and/or Operator failed to collect storm water samples within the first half of the reporting year.

198.    Plaintiff is informed and believes, and thereon alleges, that the storm water samples collected in the 2019-2020 reporting year were not timely uploaded to SMARTS in violation of Section XI(B) of the Storm Water Permit.

199.    Plaintiff is informed and believes, and thereon alleges, that in the 2020-2021 reporting year, the Facility Owner and/or Operator only collected one storm water sample from each half of the reporting year, but failed to collect a second sample as required by the Storm Water Permit.

200.    Plaintiff is informed and believes, and thereon alleges, that the Annual Reports for the 2019-2020 and 2020-2021 reporting years erroneously indicate that the

Complaint                                        30

Facility Owner and/or Operator were unable to collect the required samples because there were not enough rain events.

201.  Climatological data obtained from the National Oceanic and Atmospheric Administration ("NOAA") demonstrates that there were additional opportunities to sample significant rain events during each reporting year. *See* Ex 2 of Notice Letter.

202.  Coastkeeper representatives collected a storm water sample from the Facility on March 3, 2021 which contains an exceedance of the CTR limit for dissolved zinc, a parameter the Facility Owner and/or Operator fails to include in its sampling.

203.  The Storm Water Permit requires facilities to revise their SWPPP to include facility stabilization BMPs when industrial operations are temporarily suspended due to circumstances such as the COVID-19 pandemic. *See* Storm Water Permit, Section X(H)(3). In addition, the Storm Water Permit requires facility owners and/or operators to justify why monitoring is infeasible during the period of temporary suspension, the date the facility is fully stabilized for temporary suspension, and the projected date that industrial activities will resume. *Id.*

204.  Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has not taken any steps to indicate temporary suspension of industrial activities.

205.  The Facility Owner and/or Operator's failure to conduct sampling and monitoring as required by the Storm Water Permit demonstrates that it has failed to develop, implement, and/or revise a MIP that complies with the requirements of Section XI of the Storm Water Permit.

206.  Plaintiff is informed and believes, and thereon alleges, that in violation of Storm Water Permit Sections X(G)(2) and XI(B)(6)(c), the Facility Owner and/or Operator is not sampling for all pollutants present in its storm water discharge.

207.  Plaintiff is informed and believes, and thereon alleges, that based upon the failure to collect the required number of samples, the Facility Owner and/or Operator has failed and continues to fail to conduct and record adequate visual observations of storm

water discharges since Facility obtained permit coverage on or about November 12, 2019 in violation of Storm Water Permit, Section XI(A)(2).

208.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to conduct and record all required monthly visual observations at the Facility.

209.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's MIP requirements since at least November 12, 2019.

210.   Plaintiff is informed and believes, and thereon alleges, that the Defendants are in violation of the Storm Water Permit and the Clean Water Act because it has failed and continues to fail to adequately develop, implement, and/or revise its MIP in violation of the Storm Water Permit's MIP requirements.

211.   Every day that the facility Owner and/or operator operates with an inadequately developed, revised, and/or implemented MIP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

### I.   Defendants' Violations of the Storm Water Permit's Exceedance Response Requirements.

212.   Plaintiff is informed and believes, and thereon alleges, that based on sample results submitted by the Facility Owner and/or Operator, the Facility triggered Level 1 status during the 2019-2020 reporting year for O&G and zinc.

213.   Plaintiff is informed and believes, and thereon alleges, that sampling at the Facility during the 2020-2021 reporting year demonstrated NAL exceedances for N+N, aluminum, copper, and zinc.

214.   Plaintiff is informed and believes, and thereon alleges, that the sampling results described in paragraph 213 elevated the Facility to Level 1 ERA status for N+N, aluminum, and copper, and further elevated the Facility to Level 2 status for zinc.

215.   The Facility's Level 1 ERA Report indicates a BMP to reduce and/or prevent zinc from discharging the Facility is to cover the bar stock storage area. Plaintiff is

informed and believes, and thereon alleges that the Facility Owner and/or Operator failed to cover the bar stock storage area.

216.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has collected a storm water sample on October 25, 2021 for the current 2021-2022 reporting year.

217.   Plaintiff is informed and believes, and thereon alleges, that the storm   water sample identified in paragraph 216 exceeded the NAL values for parameters which the Facility is in Level 1 and/or Level 2 ERA status for: aluminum, copper, and zinc.

218.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to take Exceedance Response Actions as required by Storm Water Permit Section XII.

219.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit Exceedance Response Actions requirements since at least October 1, 2020.

220.   Plaintiff is informed and believes, and thereon alleges, that every day the Facility operates without timely submitting and implementing all required ERA documentation is a separate and distinct violation of the Storm Water Permit and the Clean Water Act.

## J.   Defendants' Failure To Comply With The Storm Water Permit's Reporting Requirements.

221.   Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with the Storm Water Permit's reporting requirements.

222.   Plaintiff is informed and believes, and thereon alleges, that the 2019-2020 Annual Report submitted by the Facility Owner and/or Operator erroneously certified that the Facility Owner and/or Operator was unable to sample the required number of QSEs because there were "[n]ot enough rain events."

223.   Plaintiff is informed and believes, and thereon alleges, that the 2020-2021

Annual Report erroneously certified that the Facility Owner and/or Operator was unable to sample the required QSEs because "there wasn't enough rainfall during facility hours," and that they "also reduce[d] [their] working hours due to [C]ovid virus."

224.  Plaintiff is informed and believes, and thereon alleges, that based on climatological data obtained from NOAA, there were additional opportunities to sample significant rain events during each of the reporting years described in paragraphs 224-225 herein. *See* Exhibit 2 of Notice Letter.

225.  Each of the Annual Reports indicate that the Owner and/or Operator (i) included the Identified Pollutants within the Impaired Watershed in the SWPPP's pollutant source assessment and (ii) assessed the need for analytical monitoring for the Identified Pollutants. Plaintiff is informed and believes, and thereon alleges that the Facility Owner and/or Operator failed to include dissolved copper in its SWPPP pollutant source assessment and thus did not assess the need for monitoring for said parameter.

226.  Plaintiff is informed and believes, and thereon alleges, that the Owner and/or Operator erroneously stated in each Annual Report that they conducted monthly visual observations and storm water sampling event observations.

227.  Plaintiff is informed and believes, and thereon alleges, that despite these deficiencies, the Facility Owner and/or Operator falsely certified that all of the information submitted in the annual reports was true and correct.

228.  Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has submitted inaccurate Annual Reports which fail to comply with the Storm Water Permit, and as a result, the Facility Owner and/or Operator is in daily violation of the Storm Water Permit.

229.  Plaintiff is informed and believes, and thereon alleges, that the Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit's annual reporting requirements every day since at least July 15, 2020.

230.  Every day the Facility Owner and/or Operator conducts operations at the Facility without reporting as required by the Storm Water Permit is a separate and distinct

violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a).

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Technology Based Effluent Limitations.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

231.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

232.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities at the Facility from discharging from the Facility through implementation of BMPs that achieve BAT/BCT.

233.   Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily violation of the Storm Water Permit and the CWA. Storm Water Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

234.   Defendants violated, violate and will continue to violate the Storm Water Permit Technology Based Effluent Limitations each day that the Facility is not implementing BMPs that achieve BAT/BCT standards for discharges of pollutants to waters of the United States from the Facility.

235.   Plaintiff is informed and believes, and thereon alleges, that Defendants violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

236.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm

Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

237.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

238.   Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

239.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 12, 2019 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

240.   An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

241.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## SECOND CAUSE OF ACTION

**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the Storm Water Permit's Numeric Effluent Limitations.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

242.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

243.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to comply with the Storm Water Permit's Numeric Effluent Limitations.

244. Defendants violated, violate, and will continue to violate the Storm Water Permit's Numeric Effluent Limitations each day that storm water discharges from the Facility. Storm Water Permit, Section V(C).

245. Plaintiff is informed and believes, and thereon alleges, that Defendants violated the Effluent Limitations of the Storm Water Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

246. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

247. Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

248. Each and every violation of the Storm Water Permit Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

249. By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 12, 2019 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

250. An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

251. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

/ / /

**THIRD CAUSE OF ACTION**

**Defendants' Discharges of Contaminated Storm Water in Violation of Storm Water Permit Receiving Water Limitations and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

252.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

253.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

254.   Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has and continues to be discharged each time storm water discharges from the Facility.

255.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

256.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

257.   Defendants violated, violate and will continue to violate the Storm Water Permit Receiving Water Limitations each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Facility.

258.   Plaintiff is informed and believes, and thereon alleges, that Defendants have and continue to violate the Receiving Water Limitations of the Storm Water Permit and the CWA within the applicable statute of limitations, and that such violations are ongoing and continuous.

259.   Each and every violation, within the applicable statute of limitations, of the Storm Water Permit Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

260.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 12, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

261.   An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

262.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## FOURTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

263.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

264.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the Storm Water Permit.

265.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately implement the SWPPP for the Facility, in violation of the Storm Water Permit.

266. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the Storm Water Permit.

267. Defendants have been in violation of the Storm Water Permit at the Facility every day from November 12, 2019, to the present.

268. Defendants' violations of the Storm Water Permit and the CWA at the Facility are ongoing and continuous.

269. Defendants will continue to be in violation of the Storm Water Permit and the CWA each and every day Defendants fail to adequately develop, implement, and/or revise the SWPPP for the Facility.

270. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

271. Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

272. Each and every violation of the Storm Water Permit SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

273. By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 12, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

274. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

275. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

## FIFTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Program in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

276. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

277. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the Storm Water Permit.

278. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately implement the MIP for the Facility, in violation of the Storm Water Permit.

279. Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately revise the MIP for the Facility, in violation of the Storm Water Permit.

280. Defendants have been in violation of the Storm Water Permit monitoring requirements at the Facility every day from November 12, 2019 to the present.

281. Defendants' violations of the Storm Water Permit monitoring requirements and the CWA at the Facility are ongoing and continuous.

282. The Facility Owner and/or Operator will continue to be in violation of Section XI of the Storm Water Permit and the CWA each and every day it fails to adequately develop, implement, and/or revise the MIP for the Facility.

283. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to

Complaint                                    41

waters of the United States.

284.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

285.   Each and every violation of the Storm Water Permit MIP requirements at the Facility is a separate and distinct violation of the CWA.

286.   By committing the acts and omissions alleged above, the Facility Owner and/or Operator is subject to an assessment of civil penalties for each and every violation of the CWA occurring from November 12, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

287.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

288.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against the Defendants as set forth hereafter.

## SIXTH CAUSE OF ACTION

**Defendants' Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act.**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

289.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

290.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Defendants' 2019-2020 Annual Report fails to meet the requirements of Section XVI(B) of the Storm Water Permit.

291.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that the Defendants' 2020-2021 Annual Report fails to meet the

Complaint                                              42

requirements of Section XVI(B) of the Storm Water Permit.

292.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to timely submit a Level 1 ERA Evaluation for O&G and zinc in accordance with Section XII(C) of the Storm Water Permit.

293.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to submit a Level 1 ERA Evaluation for N+N, aluminum, and copper in accordance with Section XII(C) of the Storm Water Permit.

294.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to collect and report samples in accordance with Section XI(B) of the Storm Water Permit since at least November 12, 2019.

295.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants failed to report samples to SMARTS within thirty (30) days of receipt in accordance with Section XI(B) of the Storm Water Permit since at least April 22, 2020.

296.   Defendants have been in violation of Section XII of the Storm Water Permit and the CWA every day since at least October 1, 2020.

297.   Defendants have been in violation of Section XVI of the Storm Water Permit and the CWA every day since at least July 15, 2020.

298.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the Storm Water Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

299.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

300.   Defendants' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

301.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring

from November 12, 2019, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

302.  An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

303.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays judgment against the Defendants as set forth hereafter.

## VII.   RELIEF REQUESTED

304.  Plaintiff respectfully requests that this Court grant the following relief:

a.  A Court order declaring the Defendants to have violated and in violation of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include numeric limitations and BAT/BCT requirements, for failing to meet receiving water limitations, for failing to develop and implement an adequate SWPPP, for failing to submit accurate annual reports, for failing to timely submit ERA documentation, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit;

b.  A Court order enjoining Defendants from discharging pollutants in violation of an NPDES permit;

c.  A Court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

d.  A Court order assessing civil monetary penalties for each violation of the CWA at $56,460 per day per violation for all violations that occurred after November

Complaint                                    44

2, 2015 and were assessed on or after December 23, 2020. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

e.    A Court order awarding Plaintiff its reasonable costs of suit, including attorneys', witness, experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.    Any other relief as this Court may deem appropriate.

Dated: December 29, 2021                          Respectfully submitted,

Anthony Barnes
Attorney for Plaintiff
Aqua Terra Aeris Law Group