# EXHIBIT A



October 29, 2021

**VIA CERTIFIED MAIL RETURN RECEIPT REQUESTED**

Jed Burmalhn
General Manager
Acra Aerospace LLC
2121 E. Via Burton
Anaheim, CA 92806

Alemi Properties, LLC
Attn: Shahrokh Alemi
22 Via Burrone
Newport Coast, CA 92657

The Corporation Company
Agent for Service of Process
Acra Aerospace LLC
555 Capitol Mall Suite 1150
Sacramento, CA 95814

Novaria Component Solutions, LLC
6625 Iron Horse Blvd.
North Richland Hills, TX 76180-6027

RE:   **NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE
FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT")
(33 U.S.C. §§ 1251 *et seq.*)**

Dear Mr. Burmalhn:

This firm represents Orange County Coastkeeper ("Coastkeeper") regarding violations of the Clean Water Act[1] ("CWA" or "the Act") and California's General Industrial Storm Water Permit[2] (the "General Permit" or "Permit") occurring at 2121 E. Via Burton St., Anaheim, CA 92806 (the "Facility"). The purpose of this letter (this "Notice Letter") is to put Acra Aerospace, LLC ("Acra"), Novaria Component Solutions, LLC ("Novaria"), and Alemi Properties, LLC ("Alemi") (individually and collectively, "Owner" and/or "Operator"),[3] as the owner(s) and operator(s) of the Facility, on notice of the violations of the General Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Facility into local surface waters. Violations of the General Permit are violations of the CWA. As explained below, the Owner and/or Operator is liable for violations of the General Permit and the CWA.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit. Notice must be given to the

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order 2015-0122-DWQ.
[3] Reference to the singular includes a reference to the plural, and vice versa, where the context so permits.



alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation(s). *See* 40 C.F.R. § 135.2(a)(1). This letter is being sent to you as the responsible owner(s) and/or operator(s) of the Facility or as the registered agent for these entities. This Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform the Owner and/or Operator of the Facility that Coastkeeper intends to file a federal enforcement action against it for violations of the Storm Water Permit and the Clean Water Act sixty (60) days or soon thereafter from the date of this Notice Letter.

## I.   BACKGROUND

### A.   <u>Orange County Coastkeeper</u>

Coastkeeper is a nonprofit public benefit corporation with over 1,300 members, organized under the laws of California with its office located in Costa Mesa, California. Coastkeeper was founded in 1999, and its members live, work, and recreate in and around the Orange County area. Coastkeeper is dedicated to the preservation, protection, and defense of the inland and coastal waters of Orange County including the San Gabriel River, and tributaries to the San Gabriel River. To further this mission, Coastkeeper actively seeks federal and state implementation of the Clean Water Act. Where necessary, Coastkeeper directly initiates enforcement actions on behalf of itself and its members.

Members of Coastkeeper live and own homes in the San Gabriel Watershed and use and enjoy the waters to which the Facility discharges stormwater, including Carbon Creek, Coyote Creek, the San Gabriel River, and its terminus at the Pacific Ocean. Coastkeeper members also use and enjoy these waterways to bike, boat, kayak, bird watch, ride horses, view wildlife, hike, walk, run, and engage in scientific studies including habitat monitoring and restoration activities. The unlawful discharge of pollutants from the Facility into this watershed impairs Coastkeeper members' use and enjoyment of these waters. Further, discharges of polluted storm water from the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by the Owner's and/or Operator's failure to comply with the Clean Water Act and the Storm Water Permit.

### B.   <u>The Owner and/or Operator of the Facility</u>

Information available to Coastkeeper indicates that Acra is an owner and/or operator of the Facility. Acra is currently an active Delaware limited liability company. The registered agent for service is: The Corporation Company, located at 555 Capitol Mall Suite 1150, Sacramento, CA 95814. Jed Burmahln is the Facility contact identified by Acra in its Notice of Intent ("NOI") for coverage under the General Permit and is also identified as the Legally Responsible Person in the Facility's Storm Water Pollution Prevention Plan. Information available to Coastkeeper indicates that the owner of the land upon which Acra operates its industrial business is Alemi Properties, LLC. A landowner may be liable for violations of the Clean Water Act where the owner has knowledge and control of the actions giving rise to the violations of the Act. Novaria

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 3 of 18



Component Solutions, LLC is listed as Acra's manager or member on the California Secretary of State Limited Liability Company form filed by Acra on July 26, 2019 and may also be an owner and/or operator with knowledge and control of the industrial activities giving rise to alleged violations of the Clean Water Act.

### C.  The Facility's Storm Water Permit Coverage

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the General Permit by submitting a NOI to the California State Water Resources Control Board (the "State Board") to obtain General Permit coverage. *See* Permit, Finding #12. Upon information and belief, Acra obtained Permit coverage for the Facility under the General Permit on or about November 12, 2019. The Facility's NOI identifies the operator of the Facility as Acra Aerospace, LLC with an address of 2121 East Via Burton Avenue. The NOI lists the Facility site size as 43560 square feet, with 600 square feet of industrial area exposed to storm water, and also indicated that 99% of the site, including rooftops, is impervious. The Facility's SWPPP last updated on October 14, 2020 ("Facility SWPPP") notes that the operating hours for the Facility are Monday through Thursday 5:00 AM to 2:30 PM and 5:00 AM to 9:30 AM on Friday.

Upon information and belief, the Facility applied for and obtained No Exposure Certification coverage from 2017-2018. The previous Waste Discharger Identification ("WDID") for the Facility was 8 30NEC002934. On October 22, 2019 the Regional Board sent a Notice of Violation for Non-Compliance with the General Permit for failing to file for coverage under the General Permit. On or about November 12, 2019, Acra submitted its Notice of Intent to Comply with the General Permit. The WDID number for the Facility is 8 30I028435.

The NOI lists the Primary Standard Industrial Classification ("SIC") code for the Facility as 3728 (Aircraft Parts and Auxiliary Equipment, NEC) and 3479 (Coating, Engraving, and Allied Services, NEC). The Facility must obtain Storm Water Permit coverage for the entire facility. *See* Storm Water Permit, Section XVII.E.1. Information available to Coastkeeper, including Facility's SWPPP and the Notice of Violation for Noncompliance with the General Permit sent to Acra by the Santa Ana Regional Water Board dated October 22, 2019, indicate that additional SIC codes, including 3499 (Fabricated Metal Products) and 3599 (Industrial and Commercial Machinery and Equipment), may also apply to the Facility. Information available to Coastkeeper demonstrates that the Owner and/or Operator is required to sample storm water for total suspended solids ("TSS"), oil and grease ("O&G"), pH, zinc ("Zn"), titanium, and nitrate + nitrite Nitrogen ("N+N"), copper ("Cu"), nickel ("Ni"), dissolved zinc, dissolved copper, and dissolved nickel. Pursuant to the Facility SWPPP, the Facility also samples for aluminum ("Al").

### D.  Storm Water Pollution and the Waters Receiving Discharges from the Facility

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as the Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 4 of 18



more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Upon information and belief, discharges of storm water from the Facility enter the Orange County Municipal Separate Storm Sewer System ("MS4") and into Carbon Creek, a tributary to Coyote Creek which flows into the San Gabriel River and into the Pacific Ocean (collectively, "Receiving Waters"). Discharges of polluted storm water to the San Gabriel River and the Pacific Ocean pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

The existing, potential, and intermittent beneficial uses for Carbon Creek downstream of the segment within the Santa Ana Regional Board's jurisdiction include: Municipal Supply; Warm Freshwater Habitat; and, Wildlife Habitat. *See* Basin Plan at Table 3-1. The existing, potential, and intermittent beneficial uses for Coyote Creek include: Municipal Supply; Industrial Service Supply; Industrial Process Supply; Warm Freshwater Habitat; Wildlife Habitat; and, Rare, Threatened or Endangered Species Habitat. *See id.* The existing, potential, and intermittent beneficial uses for the San Gabriel River include: Industrial Service Supply; Freshwater Replenishment; Commercial and Sport Fishing; Estuarine Habitat; Marine Habitat; Wildlife Habitat; Rare, Threatened, or Endangered Species; Migration of Aquatic Organisms; Spawning, Reproduction, and/or Early Development; and Shellfish Harvesting. *See id.*

Pursuant to Clean Water Act Section 303(d) list of impaired waterbodies, the Receiving Waters are listed for the following water quality impairments: pH, nickel, dissolved oxygen, copper, dissolved copper, dioxin, temperature, iron, toxicity, malathion, and indicator bacteria. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic dependent wildlife that depend on these waters.

## II.     THE FACILITY AND ASSOCIATED DISCHARGES OF POLLUTANTS

### A.     The Facility Site Description and Industrial Activities

The Facility's primary industrial purpose is aerospace component fabrication and manufacturing. Principal processes include turning, millings, cutting of metal alloys (aluminum, nickel, and titanium) and spray coating. Industrial activities occur both indoors and outdoors at Facility. According to the Facility's Level 1 Exceedance Response Action Report dated October 2020 (the "Report"), the Facility's operations include machine maintenance, housekeeping, sales, and administrative activities, but outsources approximately sixty percent of its machining, plating, coating, grinding, and heat-treating operations. Acra manufactures custom parts that are processed in the building fronting Via Burton using 19 computer numerical control machines, two water jet cutters, buffers, grinders, tapping machines, saw cutting machines, lathes, and manual mills. The Report further indicates that after the manufacturing processes, the Facility uses ultrasonic cleaning vats, a spray booth, a curing oven, two de-burring booths, three optical

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 5 of 18



comparators, one packing machine, and one self-contained, naphtha-based degreasing basin which are conducted in an adjoining building located to the northeast of the main building. The Facility purportedly receives stock, bar, and plate stainless steel, high nickel alloys, and titanium, and operates two propane forklifts and one electric scissor lift.

### B.   Pollutants and Pollutant Sources Related to the Facility Industrial Activities

The areas of industrial activity and industrial activities at the Facility are sources of pollutants. The Facility SWPPP indicates that potential pollutant sources at the Facility include drips and leaks of automotive fluids, machining operations, hazardous waste storage, metal bar stock and machinery stored outside, forklift and vehicle traffic, metal shavings (including chips and flakes) from production area(s), the spray stack booth, the water jet cutter, the turning/milling area(s) (including of metal alloys), the shipping and receiving area, outdoor storage of metal shavings from machining activities and of oily waste water from the jet cutter.

Information available to Coastkeeper indicates the Facility Owner and/or Operator has not properly developed and/or implemented the required best management practices ("BMPs") to address the pollutant sources and associated pollutants at the Facility. BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events. As a result of the Facility Owner's and/or Operator's failure to develop and/or implement adequate BMPs, during rain events, storm water carries pollutants from the Facility into the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

These illegal discharges of polluted storm water negatively impact Coastkeeper's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

### C.   The Facility's Storm Water Flow and Discharge Locations

The Facility contains roof drainage and sheet flow runoff that takes place in paved parking areas and driveways between the two site buildings. The stormwater ultimately drains to the south along a concrete swale located in a parking area east of the main building, which discharges into the concrete gutter of the street.

The Facility SWPPP suggests that the Facility has one discharge point and a single storm water sampling location.  The sampling point ("SP1") is located on the south driveway adjacent to the entrance/exit of the site parking lot and accepts storm water from the roofs, industrial activities, the loading/unloading area between the two industrial buildings on site, the outdoor storage of materials.

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 6 of 18



### III.    VIOLATIONS OF THE CLEAN WATER ACT AND THE GENERL PERMIT

Congress enacted the CWA in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *San Francisco Baykeeper, Inc. v. Tosco Corp*., 309 F.3d 1153, 1156 (9th Cir. 2002). The Act is administered largely through the NPDES permit program. 33 U.S.C. § 1342. In 1987, the Act was amended to establish a framework for regulating storm water discharges through the NPDES system. Water Quality Act of 1987, Pub. L. 100-4, § 405, 101 Stat. 7, 69 (1987) (codified at 33 U.S.C. § 1342(p)); *see also Envt'l. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003) (describing the problem of storm water runoff and summarizing the Clean Water Act's permitting scheme). The discharge of pollutants without an NPDES permit, or in violation of a NPDES permit, is illegal. *Ecological Rights Found. v. Pac. Lumber Co*., 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been delegated to the states. *See* 33 U.S.C. § 1342(b); *see also* Cal. Water Code § 13370 (expressing California's intent to implement its own NPDES permit program).  The CWA authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers, as well as through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b). Pursuant to Section 402 of the Act, the Administrator of EPA has authorized the State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342. The Board coordinates with the Santa Ana Regional Water Quality Control Board ("Regional Board"), which has shared jurisdiction over the Facility for state and federal water pollution control efforts.

Facilities discharging, or having the potential to discharge, storm water associated with industrial activities that have not obtained an individual NPDES permit must apply for coverage under the General Permit by filing an NOI. General Permit, Standard Condition XXI.A. Facilities must file their NOIs before the initiation of industrial operations. *Id.*

Facilities must strictly comply with all of the terms and conditions of the General Permit. A violation of the General Permit is a violation of the CWA. The General Permit contains three primary and interrelated categories of requirements: (1) discharge prohibitions, receiving water limitations and effluent limitations; (2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and (3) self-monitoring and reporting requirements. Under the General Permit, Facilities must submit Exceedance Response Action Plans ("ERA Report") to the State Board outlining effective plans to reduce pollutants if a Facility reports a pollutant above the Numeric Action Level ("NAL"). An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year[4] exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year

---

[4] A reporting year under the General Permit is July 1 to June 30.



exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. General Permit XII.A.

The General Permit also establishes numeric effluent limitations ("NELs") for facilities that discharge storm water associated with industrial activities into waterways that have approved TMDLs and have identified waste load allocations for industrial storm water discharges. NELs are numeric limits, an exceedance of which is a violation of the General Permit. The NELs require dischargers to limit the concentration of pollutants in their storm water discharges in order to protect water quality.

### A. Discharges of Polluted Storm Water from the Facility in Violation of General Permit Receiving Water Limitations

The General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance. General Permit, Discharge Prohibition III.C. The General Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Board's Basin Plan or statewide water quality control plans and policies. General Permit, Discharge Prohibition III.D. Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards in any affected receiving water. General Permit, Receiving Water Limitations VI.A, VI.B.

The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, the violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015). CTR establishes numeric receiving water limits for toxic pollutants in California surface waters. 40 C.F.R. § 131.38. The CTR establishes a numeric limit for zinc—0.12 mg/L (maximum concentration), nickel—0.47 mg/L, copper –0.013 mg/L.[5] Coastkeeper puts the Facility Owner and/or Operator on notice that it has violated and continues to violate the numeric WQS in the CTR and, by extension, the Clean Water Act, each time polluted storm water discharges from the Facility.

The Water Quality Control Plan for the Santa Ana Region ("Basin Plan") also sets forth water quality standards and prohibitions applicable to the Facility's storm water discharges. The Basin Plan includes a narrative toxicity standard which states that "([a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." The Facility's discharges include concentrations of metals and other pollutants that cause exceedances of these narrative WQS. The Basin Plan also includes a numeric water quality standard that requires a narrower pH range of 6.5 – 8.5 standard units for inland surface waters such as the San Gabriel River. *See* Basin Plan. The Facility's discharges include concentrations of metals and other pollutants that cause

---

[5] This assumes a water hardness calculation of 100 mg/L. The CTR numeric limits are expressed as dissolved metal concentrations.



exceedances of these WQSs.  For example, storm water samples uploaded to SMARTS by the Facility on April 5, 2021 demonstrate a pH level of 6 in violation of the Basin Plan's receiving water limitations. Discharges with elevated concentrations of pollutants in the storm water from the Facility adversely impact human health and the environment. These harmful discharges from the Facility are violations of the Storm Water Permit Receiving Water Limitations. *See* Permit, Receiving Water Limitation VI.

Facilities must sample and analyze for additional parameters identified on a facility specific basis to reflect a pollutant source assessment, due to receiving water impairments, and/or as required by the Regional Board. General Permit, Section XI.B.6. A Discharger that is notified by a Regional Board or who determines the discharge is causing or contributing to an exceedance of a water quality standard must comply with the Water Quality Based Corrective Actions in Section XX.B of the General Permit and report to the Regional Board regarding same. *See* General Permit Section XX.B.  Dischargers are also required to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of the General Permit's Receiving Water Limitations. General Permit, Special Condition XX.B. The documentation must describe changes the discharger will make to its current storm water BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. *Id*.

Coastkeeper puts the Facility Owner and/or Operator on notice that it is violating the General Permit Receiving Water Limitations each time polluted storm water is discharged from the Facility. *See, e.g.,* Exhibit 1. The Storm Water Permit Receiving Water Limitations are independent Permit requirements with which the Facility must comply. Violations of the Receiving Water Limitations described in this Notice Letter are ongoing. These discharge violations are ongoing and will continue every time contaminated storm water is discharged in violation of the General Permit Receiving Water Limitations. Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation VI.A of the Permit, and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation VI.B of the Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

Coastkeeper will update the dates of violation when additional information and data becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since November 12, 2019.

### B.  Discharges of Polluted Storm Water from the Facility in Violation of the General Permit's Technology Based Effluent Limitations

Any person or facility discharging storm water associated with industrial activity must comply with the General Permit. See 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1); General Permit Fact Sheet at VII. Dischargers are required to reduce or prevent pollutants in their storm water discharges through implementation of best available technology economically achievable ("BAT") for toxic and nonconventional pollutants and best conventional pollutant

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 9 of 18



control technology ("BCT") for conventional pollutants. General Permit, Effluent Limitation V.A. Conventional pollutants include Total Suspended Solids, Oil & Grease, pH, Biochemical Oxygen Demand and Fecal Coliform. 40 C.F.R. § 401.16. All other pollutants are either toxic or nonconventional. 40 C.F.R. §§ 401.15-16. To meet the BAT/BCT standard, dischargers must implement minimum BMPs and any advanced BMPs as set forth in the General Permit's SWPPP Requirements provisions where necessary to reduce or prevent pollutants in discharges. *See* General Permit, Sections X.H.1-2.

Under the General Permit, benchmark levels established by the EPA ("EPA benchmarks") serve as objective standards for determining whether a facility's BMPs achieve compliance with BAT and BCT standards as required by Effluent Limitation V.A. of the General Permit.[6] The following EPA benchmarks have been established and incorporated into the General Permit as Numeric Action Levels: total suspended solids—100 mg/L; copper—0.0332 mg/L; aluminum—0.75 mg/L; zinc—0.26 mg/L, nickel---1.02 mg/L; oil & grease—15 mg/L; iron—1 mg/L; and pH—6-9 s.u. An annual NAL exceedance occurs when the average of all analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value set forth in the General Permit. General Permit Section XII. A.1. Additionally, an instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH.

The table in Exhibit 1 sets forth the results of samples collected by the Facility Owner and/or Operator and Coastkeeper.  For the 2019-2020 Reporting Year, the Facility exceeded NALs for O+G and zinc. For the 2020-2021 Reporting Year, the Facility exceeded NALs for N+N, aluminum, copper, and zinc. The ongoing exceedances of NALs as shown in Exhibit 1 demonstrate that the Facility Owner and/or Operator has failed and continues to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards. *Santa Monica Baykeeper v. Kramer Metals, Inc.* 619 F. Supp. 2d 914. 925 (C.D. Cal., 2009).

Each day the Owner and/or Operator has failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the CWA (33 U.S.C. § 1311(a)). The violations described above were at all times in violation of Section X of the General Permit. Accordingly, the Owner and/or Operator has been in violation of the BAT and BCT requirements at the Facility every day since at least November 12, 2019.

---

[6] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009 ("Multi-Sector Permit"), Fact Sheet at 106; *see also*, 65 Federal Register 64839 (2000). *Santa Monica Baykeeper v. Kramer Metals,* 619 F.Supp.2d 914, 920, 923 (C.D. Cal 2009); General Permit, Exceedance Response Action XII.A

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 10 of 18



### C. Discharges of Polluted Storm Water from the Facility in Violation of General Permit's Numeric Effluent Limitations

On July 1, 2020, the amendment to the General Permit by Order No. 2015-0122 –DWQ became enforceable and updated pollutant-discharge standards including TMDL Implementation Requirements and Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use. General Permit Attachment E. Any two exceedances of an instantaneous NEL for a single parameter within a reporting year following July 1, 2020 is a per se violation of the General Permit and Clean Water Act. General Permit, Section V.C. The Facility is subject to the San Gabriel River TMDL requirements, including the following instantaneous NELs: copper (0.027mg/L) and zinc (0.158mg/L). The Facility exceeded these NELs in recent reporting years, and Coastkeeper alleges that the Facility will continue to exceed NELs in the future.

Since the implementation for of the NELs for the San Gabriel River in July 2020, the Facility has exceeded the NELs for zinc and copper during the 2020-2021 Reporting Year. Coastkeeper alleges that such violations occur each time storm water or non-storm water discharges from the Facility. For example, the storm water samples uploaded to SMARTS by the Facility on January 11, 2021 demonstrate copper levels at .0293 and zinc levels at .56, both of which exceed the NEL limitation for copper and zinc. In addition, the storm water samples uploaded to SMARTS by the Facility on April 5, 2021 indicate copper levels at .0589 and zinc levels at .96, both of which also exceed the NEL limitation for copper and zinc. Exhibit 2 hereto sets forth the specific rain dates on which Coastkeeper alleges that Acra has discharged storm water containing impermissible levels of pollutants in violation of the General Permit.

### D. The Owner and/or Operator Has Failed to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Plan

#### 1. General Permit SWPPP Requirements

The General Permit requires dischargers to develop and implement a site-specific SWPPP. General Permit, Section X.A. The SWPPP must include, among other elements: (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable. *See id.*

Dischargers must revise the Facility's SWPPP whenever necessary, and certify and submit SMARTS their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS any non-significant revisions not more than once every three (3) months in the reporting year. General Permit, Section X.B.



### 2. The Facility Owner and/or Operator Has Violated and Continues to Violate the Storm Water Permit SWPPP Requirements

Coastkeeper's investigation indicates that the Facility has been operating with an inadequately developed, implemented, and/or improperly revised SWPPP. For example, the General Permit requires SWPPP's to include a procedure for identifying alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned team members are temporarily unavailable; however, the Facility's SWPPP contains no such provision. General Permit, Section X.D.1.c. Additionally, General Permit Section X.E.1 requires a facility site map to include notes, legends, and other data as appropriate to ensure the map is clear, legible and understandable, but the Facility's site map contains certain figures that are not set forth in the legend and are therefore unascertainable. The site maps also lacks: (i) descriptions or depicted locations of structural control measures that affect industrial storm water discharges, authorized NSWDs, and/or run-on; (ii) identification of impervious areas at the Facility, including paved areas, covered storage areas, or other roofed structures; (iii) depictions of locations where materials are directly exposed to precipitation and the locations where identified spills or leaks have occurred; and (iv) shipping and receiving areas, fueling areas and/or vehicle storage.

In addition, the SWPPP reads: "Downspouts have been configured to efficiently convey storm water from the roof down to the surface drainage structures;" however, the site map only depicts one downspout. If there are multiple downspouts, such downspouts must be depicted on the site map. In addition, the list of industrial materials contained within the SWPPP does not sufficiently depict locations where each material is stored, received, shipped, and handled as required by General Permit, Section X. F. Furthermore, the General Permit requires a discharger to update its SWPPP to reflect irregular operating hours. It reads: "Scheduled facility operating hours that would be considered irregular (temporary, intermittent, seasonal, weather dependent, etc.) shall also be documented in the SWPPP." General Permit, Section X.D.2.d. The Facility Owner and/or Operator indicated in its 2020-2021 Annual Report that it was unable to sample the requisite qualifying storm events due in part to a reduction of working hours as a result of the Covid-19 pandemic. In violation of the General Permit, the Facility Owner and/or Operator failed to revise the SWPPP to reflect the change in operating hours during the ongoing Covid-19 pandemic.

Accordingly, the Facility Owner and/or Operator has failed and continues to fail to adequately develop, implement, and/or revise a SWPPP, in violation of SWPPP requirements of the General Permit. Each day the Owner and/or Operator failed to develop, revise, and/or implement an adequate SWPPP is a separate and distinct violation of the General Permit. The Owner and/or Operator has been in daily violation of these requirements at the Facility since at least November 12, 2019. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since November 12, 2019.

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 12 of 18



**E.** **The Owner and/or Operator has Failed to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan and Perform Monitoring**

**1. General Permit MIP Requirements**

Section X.I of the General Permit requires the Facility Owner and/or Operator to develop and implement a Monitoring Implementation Plan ("MIP") prior to conducting, and in order to continue, industrial activities. The primary objective of the monitoring and reporting requirements is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* General Permit, Section XI and Fact Sheet, Section II.J(1). Monitoring undertaken must therefore determine whether pollutants are being discharged, and whether response actions are necessary, and must evaluate the effectiveness of BMPs. *See* General Permit, Section I.J(56).

Section XI.A of the General Permit requires visual observations during dry weather at least once each month, and storm water visual observations at the same time sampling occurs at a discharge location. Monthly visual observations must include observations of any non-storm water discharges (NSWDs), all outdoor industrial equipment and activities, BMPs, and all potential sources of industrial pollution. General Permit, Section XI(a)(1). Storm water observations must document the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, and the source of any pollutants. General Permit, Section XI(A)(2). Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges. Permit, Section XI(A)(3).

Under XI.B of the General Permit, the Facility Owner and/or Operator are required to collect at least two (2) samples from each discharge location at their Facility during the first half of the reporting year, and then again during the second half of the reporting year. Storm water samples must be analyzed for total suspended solids, pH, oil & gas, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment – in addition to those required under the SIC code. *See* General Permit, Section X.G.2. Section XI(B)(6)(c) of the Permit requires permittees to analyze samples for pollutants associated with industrial operations. Section XI(B)(6) of the Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads. Section XI(B)(11) of the Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within 30 days of obtaining all results for each sampling event.

**2. The Facility Owner and/or Operator Has Violated and Continues to Violate the General Permit MIP Requirements**

The Facility Owner and/or Operator has been and continues to conduct operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 13 of 18



For example, the Facility Owner and/or Operator has failed and continues to fail to collect storm water discharge as required. In the 2019-2020 reporting year, the Facility Owner and/or Operator collected two storm water samples within the second half of the reporting year, but failed to collect any storm water samples within the first half of the reporting year. Similarly in the 2020-2021 reporting year, the Facility Owner and/or Operator only collected one storm water sample from each half of the reporting year, but failed to collect a second sample as required by the General Permit Section XI.B.3. The Annual Reports for the 2019-2020 and 2020-2021 reporting years erroneously indicate that the Facility Owner and/or Operator were unable to collect the required samples because there weren't enough rain events. Based on climatological data obtained from NOAA, there were additional opportunities to sample rain events during each reporting year. *See* Exhibit 2. As of the date of this Notice Letter, the Facility has not uploaded a single sample for the current 2021-2022 reporting year.

Coastkeeper staff was able to collect a storm water sample from the Facility on March 3, 2021. In addition to an NAL exceedance for total zinc, Coastkeeper's sampling results indicate an exceedance of the CTR limit for dissolved zinc, a parameter the Facility has failed to include in its prior sampling. *See* Exhibit 1. This indicates that the Facility Owner and/or Operator is not sampling for all pollutants present in its discharge. In addition, sampling results further indicate that the Facility Owner and/or Operator is not sampling all required parameters present at the Facility, including pH, titanium, dissolved copper, and dissolved nickel.

Coastkeeper also alleges that, based on the lack of storm water monitoring conducted by the Owners and/or Operators, the Facility is not conducting monthly dry weather visual observations, sampling event visual observations, and is not recording said observations and/or maintaining records as required by the General Permit.

If the Facility Owner and/or Operator has temporarily suspended industrial activities due to COVID19 or some other circumstance, the facility must comply with Permit Section X.H.3. by revising its SWPPP to include facility stabilization BMPs. In addition, it must justify why monitoring is infeasible during the period of temporary suspension, the date the facility is fully stabilized for temporary suspension, and the projected date that industrial activities will resume. Permit Section X.H.3. Based on information available to Coastkeeper, the Owner and/or Operator has not taken any steps to indicate temporary suspension of industrial activities.

The Facility Owner and/or Operator's failure to conduct sampling and monitoring as required by the General Permit demonstrates that it has failed to develop, implement, and/or revise an MIP that complies with the requirements of Section XI of the General Permit. Every day that the Facility Owner and/or Operator operates with an inadequately developed, revised, and/or implemented MIP, is a separate and distinct violation of the General Permit and the Clean Water Act. The Facility Owner and/or Operator has been in daily and continuous violation of the General Permit's MIP requirements since at least November 12, 2019. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Facility Owner and/or Operator are subject to civil penalties for all violations of the Clean Water Act occurring since November 12, 2019.

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 14 of 18



### F. Failure to Comply with the General Permit's Exceedance Response Requirements

#### 1. General Permit Exceedance Response Requirements

Under the General Permit, facility operators are required to perform Exceedance Response Actions ("ERAs") as appropriate whenever sampling indicates NAL exceedances. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. There are three (3) ERA levels: Baseline, Level 1, and Level 2. Each facility starts in baseline status. If a discharger enters Level 1 for exceedances of any constituent in a reporting year, that facility must prepare a Level 1 ERA Evaluation and Report to adequately address the polluted discharges. Should the facility's sample results average over the annual NAL for a second consecutive year for the same constituent, the facility must prepare a Level 2 ERA Action Plan and Technical Report requiring further BMPs to address the exceedances. Both Level 1 and Level 2 ERA reports and plans must be submitted via SMARTS to the State Water Resources Control Board.

#### 2. The Owner and/or Operator Has Violated and Continues to Violate the General Permit's Exceedance Response Requirements

Based on sample results submitted by the Facility Owner and/or Operator, the Facility triggered Level 1 status during the 2019-2020 reporting year for O+G and zinc. The Facility Owner and/or Operator was required to (i) complete a Level 1 ERA Evaluation by October 1, 2020, (ii) prepare and submit a Level 1 ERA Report to SMARTS by January 1, 2021, and (iii) amend the SWPPP accordingly with revisions uploaded to SMARTS by January 1, 2021. The Facility Owner and/or Operator failed to upload the Level 1 ERA Evaluation until November 9, 2020—late and in violation of the General Permit ERA requirement.

Similarly, sampling reported by the Facility for the 2020-2021 reporting year demonstrated NAL exceedances for N+N, aluminum, copper, and zinc. This elevates the Facility into Level 1 ERA status for N+N, aluminum and copper, and elevates the Facility to Level 2 status for zinc. The Facility Owner and/or Operator failed to complete a Level 1 ERA Evaluation by October 1, 2021 for N+N, aluminum, and copper, in violation of the General Permit. Information available to Coastkeeper, including the Facility SWPPP, indicates that the Facility has failed to implement the BMPs described in its Level 1 ERA document.

Accordingly, the Facility Owner and/or Operator has failed and continues to fail to adequately submit and implement Exceedance Response Actions as required by Section XII of the Permit. Every day the Facility operates without submitting and implementing all required Level 1 ERA reports is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owner and/or Operator has been in daily and continuous violation of the Storm Water Permit Exceedance Response Actions requirements since at least October 1, 2020. These violations are ongoing, and Coastkeeper will include additional violations when

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 15 of 18



information becomes available. The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since November 12, 2019.

### G.  Failure to Comply with the General Permit's Reporting Requirements

Section XVI of the General Permit requires a permittee to submit an Annual Report to the Regional Board by July 15 following each reporting year. Section XVI of the Permit requires that the Annual Report include a compliance checklist that indicates that a discharger complies with and has addressed all applicable requirements of the Permit, an affirmation of visual observations and sampling results, an identification and explanation of any non-compliance, an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. General Permit Section XVI. Annual Reports are certified by the Legally Responsible Person under penalty of perjury.

The Facility Owner and/or Operator has failed and continues to fail to submit Annual Reports that comply with the General Permit's reporting requirements. For example, the 2019-2020 Annual Report certifies that the Facility was unable to sample the required number of QSEs because"[n]ot enough rain events." The 2020-2021 Annual Report similarly certifies that the Facility was unable to sample the required QSEs because "there wasn't enough rainfall during facility hours," and that they "also reduce our working hours due to covid virus." These statements contradict the rain data attached hereto as Exhibit 2. Additionally, each of the Annual Reports indicate that the Owner and/or Operator (i) included the identified pollutants within the Impaired Watershed in the SWPPP's pollutant source assessment and (ii) assessed the need for analytical monitoring for the identified pollutants. On the contrary, the Facility Owner and/or Operator failed to include dissolved copper in its SWPPP pollutant source assessment and thus did not assess the need for monitoring said parameter. Furthermore, the Owner and/or Operator stated in their Annual Reports that they conducted monthly visual observations and storm water sampling event observations, but based on information available to Coastkeeper, the Facility has failed to conduct such observations and/or maintain records of such observations. Ultimately, the Facility Owner and/or Operator erroneously certified that all of the information submitted in the annual reports were true and correct.

As such, the Owner and/or Operator is in daily violation of the General Permit. Every day the Facility Owner and/or Operator conducts operations at the Facility without reporting as required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owner and/or Operator has been in daily and continuous violation of the General Permit's reporting requirements every day since at least November 12, 2019. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available, including specifically violations of the General Permit reporting requirements (*see* General Permit, Section XVI.). The Facility Owner and/or Operator is subject to civil penalties for all violations of the Clean Water Act occurring since November 12, 2019.

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 16 of 18



## IV.  NAME AND ADDRESS OF NOTICING PARTY

The name, mailing address, and telephone number of the noticing party is as follows:

Sarah Spinuzzi
Orange County Coastkeeper
3151 Airway Ave, Suite F-110
Costa Mesa, CA 92626
(714) 850-1965
sarah@coastkeeper.org

## V.  COUNSEL

Coastkeeper has retained legal counsel to represent it in this matter. Please direct all communications to:

Anthony M. Barnes
Aqua Terra Aeris Law Group
4030 Martin Luther King Jr. Way
Oakland, CA 94609
(917) 371-8293
amb@atalawgroup.com

## VI.  RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4), each separate violation of the CWA commencing five years prior to the date of this Notice of Violation and Intent to File Suit subjects Compton Steel to a penalty of up $56,460 per day per violation.

In addition to civil penalties, Coastkeeper will seek: injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d); declaratory relief; and other such relief as permitted by law.

Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper will seek to recover its costs, including attorneys' and experts' fees, associated with this enforcement action.

## VII.  CONCLUSION

Coastkeeper intends to file a citizen suit under Section 505(a) of the CWA against the Owner and/or Operator and its agents for the above-referenced violations upon the expiration of the 60-day notice period. If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next twenty (20) days so that they may be

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 17 of 18



completed before the end of the 60-day notice period. We do not intend to delay the filing of a
complaint in federal court if discussions are continuing when that period ends.


Sincerely,


Anthony M. Barnes
Aqua Terra Aeris Law Group

CWA Notice of Intent to Sue
Acra Aerospace LLC
October 29, 2021
Page 18 of 18



# SERVICE LIST

## *VIA U.S. MAIL*

Merrick Garland
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Deborah Jordan
Acting Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Michael S. Regan
Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460 (1101A)

Jayne Joy
Executive Officer
Santa Ana Regional Water Quality Control Board
3737 Main Street, Suite 500
Riverside, CA 92501-3348

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812-0100

# EXHIBIT 1

Acra Aerospace Facility - Storm Water Sample Exceedance Chart

| Date of Sample Collection | Sample Location | Parameter | Result | Unit | NAL Benchmark | NEL | California Toxics Rule | Sample Collected By |
|---|---|---|---|---|---|---|---|---|
| **2019-2020 Reporting Year** | | | | | | | | |
| 03/11/2020 | SP-1 | O+G | 28.4 | mg/L | 15 | N/A | none | Acra |
| 04/06/2020 | SP-1 | O+G | 6.4 | mg/L | 15 | N/A | none | Acra |
| 03/10/2020 | SP-1 | Zinc | .324 | mg/L | .26 | N/A | none | Acra |
| 04/06/2020 | SP-1 | Zinc | .211 | mg/L | .26 | N/A | none | Acra |
| **2020-2021 Reporting Year** | | | | | | | | |
| 12/28/2020 | SP-1 | N+N | .689 | mg/L | .68 | N/A | none | Acra |
| 03/03/2021 | SP-1 | N+N | 2.02 | mg/L | .68 | N/A | none | Acra |
| 12/28/2020 | SP-1 | Aluminum | .685 | mg/L | .75 | N/A | none | Acra |
| 03/03/2021 | SP-1 | Aluminum | 2.07 | mg/L | .75 | N/A | none | Acra |
| 12/28/2020 | SP-1 | Copper | .0293 | mg/L | .0332 | .027 | none | Acra |
| 03/03/2021 | SP-1 | Copper | .0589 | mg/L | .0332 | .027 | none | Acra |
| 12/28/2020 | SP-1 | Zinc | .564 | mg/L | .26 | .158 | none | Acra |
| 03/03/2021 | SP-1 | Zinc | .96 | mg/L | .26 | .158 | none | Acra |
| 03/03/2021 | SP-1 | Dissolved Zinc | .21 | mg/L | N/A | N/A | .12 | OCCK |
| 03/03/2021 | SP-1 | Zinc | .27 | mg/L | .26 | .158 | none | OCCK |

# EXHIBIT 2

**EXHIBIT 2**

<u>Acra – Rain Data – Storm Events[1] Near the Facility[2] Per Reporting Year</u>

| 2019-2020 | |
|---|---|
| **Date** | **Precipitation (Inches)** |
| 11.20.2019 | 0.22 |
| 11.27.2019 | 0.32 |
| 11.28.2019 | 1.03 |
| 11.29.2019 | 0.47 |
| 12.04.2019 | 0.80 |
| 12.05.2019 | 0.73 |
| 12.06.2019 | 0.13 |
| 12.23.2019 | 0.87 |
| 12.26.2019 | 1.42 |
| 01.17.2020 | 0.30 |
| 03.10.2020 | 0.40 |
| 03.12.2020 | 0.90 |
| 03.13.2020 | 0.64 |
| 03.17.2020 | 0.30 |
| 03.20.2020 | 0.12 |
| 03.23.2020 | 0.80 |
| 04.06.2020 | 0.86 |
| 04.07.2020 | 0.31 |
| 04.08.2020 | 0.27 |
| 04.09.2020 | 0.36 |
| 04.10.2020 | 0.48 |
| 05.19.2020 | 0.27 |

| 2020-2021 | |
|---|---|
| **Date** | **Precipitation (Inches)** |
| 12.28.2020 | 1.20 |
| 12.29.2020 | 0.26 |
| 01.25.2021 | 0.20 |
| 01.29.2021 | 1.12 |
| 03.03.2021 | 0.39 |
| 03.10.2021 | 0.60 |
| 03.11.2021 | 0.10 |
| 03.15.2021 | 0.15 |

---

[1] This Exhibit shows storm events yielding at least 0.1 inches of rainfall in a 24-hour period per reporting year since July 1, 2019.

[2] This chart uses rain data from a rain gauge located at 33.8647° N, -117.8425° W in Anaheim, on N. Tustin Ave near Anaheim Lake.  This data is available at <u>Search | Climate Data Online (CDO) | National Climatic Data Center (NCDC) (noaa.gov)</u>.